The first case today is 141821, United States v. Derrick Hinkley, etc. Thank you. Good morning, Mr. Hughes. Good morning, Your Honor. May it please the Court, I'm James Hughes and I represent the appellant Derrick Hinkley. In the evening hours of July 17, 2012, Mr. Hinkley was interrogated in a small windowless room in the Lewiston Police Department. And for the first 38 minutes of the interrogation, he was not given Miranda. According to the four factors of U.S. v. Hughes, I believe that shows that he was in custody. When was it you claim he became in custody? When he entered the room and was questioned by the police. I'd say at the beginning of the question of the police officer. At the beginning, that's where the officer says to him, you're free to go, and do you want me to keep the door open or closed, and it's whatever you want. How is that putting someone in custody? You're right, Your Honor. That certainly favors the government, those points, but I think there are other points that favors custody. For example, there were many police officers, not in the room, but around. But that's always true at the station. I guess if you start with the proposition that the police call someone up on the phone and say, you may be a suspect, we're not sure, would you come down and talk to us down at the station? And the person says, sure, drives over to the station, walks in, the officers say, we want to talk to you, you're not under custody. It seems to me that is a norm that would not be a custodial situation here. And if that's correct, I'm having great difficulty distinguishing this case from that and finding out when you think it changed. Well, another, well, if this is compared, for example, to the Hughes case, which was called a close call, where he was questioned in his home up in Isle of Hope, the judge herself felt that there were issues with this and said that the police officer was skating close to the edge. So I do think that the point you make is valid, but I think the closed door, the door was closed, there were no windows. I think that there was enough there to show that he was in custody. But I understand, Your Honor, that certainly there are points for the government, too, in that respect. With respect to what the judge said, she said, I don't see why Miranda wasn't communicated to the jury in the first place. And on the second issue of whether there was a valid waiver of Miranda, we had the expert witness, Dr. Donnelly, testify, and he testified that Mr. Hinckley felt compelled to cooperate in the interrogation and search. He didn't have the capacity to assert his rights due to the totality of the circumstances. Mr. Hughes, again, when you watched the video of the search, it seemed to me that your client was remarkably resistant to a very sort of skillful and almost oppressive interrogation for a period of time. In other words, he didn't, prior to being taken into custody, he wouldn't agree and wouldn't admit and was thinking of ways to get around the point of the questions. Can't we take that into consideration in deciding whether he was the type of person who would feel compelled? Yes, Your Honor. And he is a type of person who has numerous mental health issues. And as Dr. Donnelly said, he couldn't form the capacity to waive his Miranda, is what Dr. Donnelly said, and that was unrebutted by any expert testimony of the government. Counsel, you know, there's a very interesting issue when a video is available to a district court judge and also to the court of appeals judges. In your answer to Judge Kayada, you seem to suggest that we could do de novo review of the district court's finding based on our own view of the video. Is that your position? No, Your Honor. I understand, Your Honor. It's not a de novo. It's not that at all. Maybe I'll move on to the consent to search. Even the judge noted the bungled manner in which St. Laurent, the police officer, secured Hinckley's signature to the consent. And as she said, I quote, And as confusing as the exchange was in writing, the video shows it was a more confusing lie. And Dr. Donnelly stated the consent to the search was more acquiescence. I think with respect to the issue of the second jailhouse interrogation, I have nothing to add apart from the brief and what I previously said on the other one. In terms of the sentencing issues on the five-level enhancement for, this was, I guess, victim three and minor number one, it does seem to me, Kafka asked that he was not permitted to cross-examine the child or at least have been given information about this child, whether there were mental health issues. He was certainly committed at one point, his family history, school records, state agency involvement, but the lawyer for Hinckley was not given those, whether they were male friends, why was the family in a motel for several months. I think there are issues there that could have provided cross-examination there. And I don't, now the government assumes that the mental breakdown was caused by Hinckley, but I don't see any evidence of that. And then in terms of the two-level, oh yeah, and certainly the sentencing judge can take information into consideration that has sufficient indicia of reliability. And also though 6A1.3, which talks about that in the guidelines, says that these issues must be resolved with care and the court must ensure the parties have an adequate opportunity to present relevant information. So my point there is that I would submit that the defense counsel should have been allowed information in this case. In terms of the two-level increase regarding the sexual contact, I understand the U.S. v. Schaefer case out of the 5th Circuit, but I would suggest there's no 1st Circuit precedent on that. And that Title 18 U.S.C. 2246 defines sexual contact as intentional touching either through the eyes or through the mouth. And in this case, it was intentional touching through the clothes or actual touching. And here there was no touching. Counsel, this actually is a difficult issue. The language is not very clear in the statute as to how it would apply here. But does it make any difference, even if the court were in error and there were two points fewer, it would still make no difference? Well, it will be in roughly the same guidelines range, constrained by the mandatory minimum. Are you conceding that any error would have been harmless here and would not be a basis for a remand? I think so. The part about the age, application note does include age in addition to the identity. I'm sorry, are you conceding that if error, it was harmless? Yes, with respect to the two-level increase, yes. And then if I can finally deal with the reasonableness of the sentence, and I know it's not de novo here, but I would submit that it's unreasonably high, because as the government points out, the major reason for the high sentence was to protect the public from Mr. Hinckley. But when he's released, he's going to be on lifetime supervised release. He's going to be on lifetime sex offender registrant, which often entails electronic monitoring. So I would submit that the public would be safe anyway, and that the three other points here, that there was no prior juvenile or adult convictions, and that he was the victim of multiple incidents of sex abuse as a child, and he has multiple mental health diagnoses, ADD, borderline intellectual functioning, et cetera, and he looks young, and as Dr. Donnelly points out, that he's vulnerable to abuse in the prison. So I would submit that a 15 to 20-year sentence would be sufficient, but not greater than necessary. And that's all I have to say, Your Honor. If you have any other questions, sit down. Good morning, Your Honors. May it please the Court, Renee Bunker on behalf of the United States from the District of Maine. I, too, will start with a custody question and point out that the comment that the district judge made regarding St. Laurent appears to have been made with the misapprehension, going to Judge Chiata's comment, that Miranda was required for any station house interview, and that theme sort of resonated throughout that oral argument. The comment that the appellant then highlights about Ms. St. Laurent. Well, it would be a nice, clear rule to apply. So what is it about this case that you say makes it such a rule inapplicable? I understand you're saying that is not the law. It is not the law that if you are interrogated at a station house, it is necessary that you be given a Miranda warning at the beginning. But what is it about this case that excuses the failure to give the Miranda warning? Mr. Hinckley arrived at the station on his bicycle entirely voluntarily, said no problem, I'll meet you there. Mr. Hinckley was in the unfamiliar settings, that first prong, in favor of finding custody. He was in the interrogation room. There was one officer, only one officer asking questions. There may have been other officers milling around. That would be the case anywhere, in any police station. The officer right from the get-go told Mr. Hinckley he was not under arrest. The tone began, as the court found, quite politely, and even when, in face of the denials and the denials of denials, Detective St. Lawrence, although frustrated, did not become aggressive with Mr. Hinckley. And after the denials continued and continued, at about 30 minutes in, St. Lawrence told Hinckley he was still free to go, and it's a completely objective test, and a reasonable person in those circumstances, as the district court found, would have believed what St. Lawrence told him until about eight minutes later, when he was ultimately told you're no longer free to go at just shy of 40 minutes into the interview. Under those totality of the circumstances, with a completely objective test in play here, it is a bright-line rule. I mean, the Supreme Court has made clear that it is not, Matthias and I think it is, that the fact that they're at the police station is not dispositive here. And we disagree that, again, the comment regarding St. Lawrence skating close to the edge, that appears to be made under that misapprehension that Miranda was required at the get-go. And the judge also, Appellant has highlighted about the constitutional rights, the judge also proceeded to find that the detective did not violate any of St. Lawrence constitutional rights. And in this case, the video, Judge Lynch, you mentioned, the reason they were at the station was that the detective wanted the recording, wanted the interview to be recorded so that everyone here could see it and it would be preserved. So to that extent, and that was the district court, it was alleged that that was a nefarious purpose on the detective's part to drag him into the station. But the district court found otherwise, and the testimony was clear on that factor. At what point was the government aware of the defendant's problems, his disorders, and does it make any difference? With regard to the custody issue, Judge Troy, no, we submit it makes no difference. With regard to the consent issue and Miranda waivers, it begins to play in. And I noted your concurrence in Hughes. And it's important, and contrasting Connolly, let's start with the Supreme Court's Connolly opinion, which makes it clear that there's no right to confess to a crime when you're completely rational and properly motivated. And then even if, once somebody understands Miranda rights, and that's been established, even if they, out of some crazy impulse, confess, the Supreme Court has made clear, that confession is admissible because it's not produced, assuming as here, it's not produced by police coercion. And going, then I wanted to jump to your concurrence in Hughes, where even unlike in Hughes, here Detective St. Laurent, he wasn't even going to talk with Hinckley, he was going to talk with the victim's families after learning that Hinckley had, this guy, Derrick Hinckley, who he had never met, forced these two boys to masturbate under a threat that he would cut their penises off if they didn't, and he was headed to talk to the victim's family. So he had, and he'd never met Hinckley. He happened on a hunch to see this guy surrounded by children, and he had no idea about Hinckley's past, unlike the agents in Hughes, and even, again, a video is worth 10,000 words in this case, because there is no indication in that video of any outward manifestation of mental illness, or cowering, or due anxiety, unlike Mr. Hughes, who had that anxiety attack. Throughout that entire interview, as the district court found, rather than cower to the interrogation, he, Hinckley, may have stayed with great fortitude, his denials and denials and denials. He had no problem lying throughout the interrogation to Detective St. Laurent. And so, unlike in Hughes, even where that was a closed case, this is even further, and here there was no chicanery. St. Laurent, again, I think some of the court's comments during that oral argument also went to the fact that some, perhaps, misapprehension that the fact that an agent confronts a suspect with even overwhelming credible evidence of a crime has anything to do with the custody question. Mathiasson, the Supreme Court has made clear that it's irrelevant to whether someone's in custody. And here, St. Laurent only presented Mr. Hinckley with the truth, truthful allegations. He wasn't employing these. Mathiasson, they were falsely damning statements that the agents were putting to the suspect. And so here we have nothing like what the agents knew in Hughes, and also no chicanery, no ruse, or anything of that sort that would play into it. We also have the video, which, of course, this court will watch and make its own assessment about the capacity and competence and calculating, really, the way that interrogation proceeded and the way Mr. Hinckley was able to morph his statements in quite ingenious ways, I think is how the district court put it, is also quite telling. Do you think we make our own, are you saying we make our own assessment, or do we form an opinion regarding whether there was clear error or abuse of discretion by the trial judge in making an assessment? No, it's a deferential standard. I think we all agree on the standard of review. I thought there was a case of Supreme Court cases that, it wasn't a video, and I can't remember the name of the case, but a leading case on findings of fact that we can't, that we have to basically follow, even though that was a case involving a document, that we are not free to make our own assessment as to the facts that are found by the district court. I'm not sure what case you're referring to, but I think we all agree that the review of the findings of fact would be for clear error. Displace, or something like that, I can't recall the name. I'm under the impression that we are not free to make the normal findings. No, short of a finding of clear error, which we would submit on this record is not even close. With that, I can turn to the five-level increase, unless the court has further questions on the consent and custody issue. The five-level increase was ably supported. One, the idea, I think the concession has been made that the Sixth Amendment confrontation right does not exist here at sentencing, but here it was hauntingly similar, Minor One's allegations regarding Hinckley. I want to highlight nine corroborated or frighteningly similar factors that Minor One pointed out that support, plus two other factors that support the district court's reliability finding. One, Minor One said he met Hinckley at the Motel 6 where it was undisputed that Hinckley had worked. Two, Hinckley befriended Minor One in much the same way that he befriended Victim One and Victim Two. Minor One called him buddy-buddy. Three, Minor One knew Derrick Hinckley wanted to be called Ethan, which Hinckley told St. Lawrence he preferred Ethan. Minor One's mother reported that the reason she let Minor One go for sleepovers at Hinckley's was because he repeatedly pressed her to give the parents a break and he would take the siblings for an overnight. Similar modus operandi with Victims One and Two. Minor One described the location and the interior of Hinckley's Main Street apartment, which when you look at how Hinckley himself for St. Lawrence described his apartment, it was strikingly similar. Minor One described that scorpion knife which immediately attracted Minor One's eye on Hinckley's wall. Hinckley for St. Lawrence described that scorpion knife that sent Victim Two into an anxiety attack. This is all very helpful, but I think his complaint is that the government knew a lot more about Minor One, which during discovery it did not disclose to the defense, which the defense might have used to its advantage. And he likens it to the confrontation clause, but the basic dispute goes back to an imbalance of information. So what's the response to that? The government I think produced some discovery and did not go fishing into the DHH records. The list on page six of the appellant's reply brief is remarkable in terms of the fishing expedition that appellant seems to think the government had to do on its own. That was not done by the government. At the same time, I've seen no authority cited by the appellant that that fishing expedition is either required on the government's part under these circumstances or authorized on the appellant's part. This court, Mills was a somewhat analogous case that we cited, I think Judge Lynch you were on that panel, about the CIs and the government's refusal to disclose the names of the CIs, though I think as in this case it might be somewhat obvious to the defendant who the identity is. But the test, it's the defendant's burden to show that disclosure of the identity is warranted under circumstances like this. And it is not met, I think the court said, by mere speculation that something might be found. This appears to be a fishing expedition with all due respect. It was undisputed that the defendant had, I mean the defendant, minor one, the 11-year-old boy, had some counseling when his biological father died. That was all presented. Prosecutor in the district court disclosed that he went into a complete meltdown after making the disclosures regarding Hinckley, perhaps not surprisingly. And so there were disclosures made in terms of... Are you saying the government knew no more than the defense? Or are you saying the obligation was on them to show that you had to press harder? I'm a little unclear. I don't think the government did that fishing expedition. We learned about this minor report and we didn't go searching through DHH...Detective Dumont, I'm getting the names, he sincerely, I think, replied, I do not know. That was not part of the investigation. Minor one's mother brought minor one in and said, hey, there were the two interviews that were disclosed. My understanding is we were having a hard time relocating minor one because he had gone into such a meltdown and become unavailable as a witness and the state charges were not pursued and that was all shared with defense counsel. So I don't think there was any secret here. I think minor one was unavailable in terms of his meltdown as to what had happened. And there's no requirement I know of to go search through school records and the, I'll call them the page six files from the reply brief. Unless there... We would ask on the, I guess it's harmless error, but the second, third, sixth, and eleventh circuits have held that under circumstances like this forced masturbation under these circumstances would qualify. So to the extent the court wants to entertain that I would add that otherwise we would ask that you inform. Thank you.